(101 App. Div. 216)

### PEOPLE ex rel. DWYER v. HOGAN, Mayor.

(Supreme Court, Appellate Division, Third Department. January 4, 1905.)

1. CERTIORARI—EXTENT OF REVIEW.
   Under Code Civ. Proc. § 2140, relating to review on certiorari, on the review of the decision of the mayor on charges of neglect of duty preferred against an appointive officer of the city, the question to be determined is whether there is such a preponderance of evidence against the existence of the facts found that a verdict of a jury affirming the existence thereof, rendered in an action in the Supreme Court triable by jury, should be set aside by the court as against the weight of evidence, though the relator alleges that, in the making of the decision, rules of law were violated to his prejudice.

2. CEMETERIES—OWNERSHIP OF LOTS.
   In the absence of a rule governing a cemetery which requires any specific evidence of the right to use any lot, the person in whose name a lot stands on the record is entitled to the use of such lot.

3. SAME—MISCONDUCT OF SUPERINTENDENT.
   The fact that the superintendent of a cemetery caused an old grave to be disturbed in the digging of a new one is not ground for his discharge, where there was nothing to indicate the existence of the old grave.

4. SAME—REVIEW OF DISCHARGE OF SUPERINTENDENT.
   The fact that charges against the superintendent of a cemetery are stale, and have once been considered and dismissed by a former mayor, may be considered on certiorari to review the discharge of the superintendent by a subsequent mayor.

5. SAME—SUFFICIENCY OF EVIDENCE.
   Evidence on charges of misconduct preferred against the superintendent of a city cemetery considered, and *held* insufficient to warrant his discharge.

Certiorari, on the relation of Thomas H. Dwyer, against Joseph F. Hogan, mayor of the city of Troy, to review the determination that relator was guilty of certain charges of neglect of duty preferred against him as superintendent of the public cemetery. Reversed.

The charges were 10 in number. Of these, the first six, and the tenth were sustained. The charges in the seventh, eighth, and ninth specifications were dismissed. Under the first specification the respondent found the relator guilty of permitting the burial of the body of the child of one Ray in a lot in the cemetery owned by one Mary Ann Scudder, without the written consent of said Scudder, which fact was known to relator at the time of such burial. Under the second specification the respondent has found the relator guilty of causing numerous graves in the Mt. Ida Cemetery to be dug up, and the bones of the bodies previously buried in said graves to be taken out and laid on the ground adjoining said graves, and another body subsequently interred in said grave; that the bones of the body previously taken out of said grave were subsequently placed in a hole which was dug out of one of the ends of said grave. Under the third specification the respondent has found the relator guilty of allowing more than one body to be buried in one grave, contrary to the rules and regulations governing burials in said cemetery. Under the

fourth specification the respondent has found the relator guilty of allowing and causing a grave to be dug in the said cemetery, and bones of a body buried therein to be taken out and to remain exposed for some period of time, which bones were subsequently reinterred in the Mt. Ida Cemetery by a person who was not officially connected with said cemetery. Under the fifth specification the respondent has found the relator guilty of requesting one Kehn and one Knight to procure horses and set them loose in a part of the cemetery called the "Jewish Cemetery," for the purpose of causing mischief therein; thereby causing the discharge of one Scudder, who was at the time acting as superintendent of that part of the cemetery. Under the sixth specification the respondent has found the relator guilty of incompetency and conduct inconsistent with the duties of his position, in digging up and removing a certain water pipe, so that the grass on the graves of the Jewish Cemetery could not be sprinkled. Under the tenth finding the respondent has found the relator guilty of failing to furnish proper help and assistance to workmen to remove bodies from the vault in the said cemetery to their graves, so that said bodies were roughly dropped into the grave in an improper manner. Upon this decision the relator was removed from the office of superintendent of the public burial grounds of the city of Troy, and to review this determination this writ of certiorari has been allowed.

Argued before PARKER, P. J., and SMITH, CHASE, CHESTER, and HOUGHTON, JJ.

James Farrell, for relator.
John T. Norton, for respondent.

SMITH, J. While the relator charges that, in making the determination, rules of law have been violated, affecting his rights, and to his prejudice, the real question here for determination is whether there was, upon the evidence, such a preponderance of proof against the existence of the facts found that a verdict of a jury affirming the existence thereof, rendered in an action in the Supreme Court triable by a jury, would be set aside by the court as against the weight of evidence. Code Civ. Proc. § 2140. The relator was a veteran of the Civil War, and his right to the position to which he was appointed is assured to him by the laws of the state, unless he be found guilty of misconduct in a judicial proceeding, which is required to be instituted upon charges preferred and answered before the mayor of the city. This protection is intended to be substantial. This trial is given for something more than a mere pretext for dismissing one from office who is protected by the statute. We have carefully examined the evidence that was produced both for and against the relator, and, in our judgment, the proof falls far short of the required legal condition which would authorize his removal.

As to the first finding, John Ray stood upon the record which was in the hands of the relator as the sole owner of the lot in which he demanded that his child should be buried. There were two children already buried upon that lot, claimed by Ray to have been his children. Not a doubt was suggested to the relator of the right of Ray to have the burial upon that lot. He had no information whatever that any transfer was claimed to have been made to Mary Ann Scudder. No rule governing the conduct of the cemetery is shown which requires any specific evidence of the right to burial in any location, and the relator could have done nothing else than to have granted the right claimed by Ray, who was the record holder of the lot.

The second, third, and fourth charges relate to the care by the relator of what is called the "Potter's Field." That is a certain part of the cemetery which was set off for the burial of the poor. This part of the cemetery consisted, in all, of only about a quarter of an acre. The city's poor had been buried there since 1854. One of the witnesses swore that the field was buried over three or four times. The matter was called to the attention of the city by the report of the superintendent in 1900, and no relief was given him by the city authorities, and no more ground was furnished him in which to make burials. It was impossible to distinguish where the graves were, as no markers were put up; and, prior to the relator's time and since, it has been the custom to take a long iron probe and drive it into the ground to see if a box was struck, and, if it appeared to be free, there to dig a grave. Of course, in this arrangement, necessarily, they would cross some parts of some graves that had already been placed there; and, prior to the relator's time and thereafter, it was customary to find bones of bodies in the attempt to dig a grave. The evidence is to the effect that the relator would dig up these bones and lay them aside until the grave was dug, and then at the end or the side of the grave would dig a further space, into which these bones were carefully placed. These findings have been made the basis, in part, of his discharge. It is difficult for me to see what else could well have been done. It is apparent that sufficient ground was not furnished, so that graves could be dug without interfering with bodies that had theretofore been buried. It was not the fresh mounds put over graves which the relator had dug that were disturbed, but the graves of long standing, where the ground gave little or no indication of their existence. In meeting the conditions which he found, he exhibited no heartlessness, and no conduct that would tend to shock those whose friends were there buried. He was required to find graves upon ground that was already covered with graves. He apparently did the best he could, and we are unable to find any fault upon his part which could be made the basis of his discharge. I am referred upon the brief to no evidence, and I have not been able to find any, where bones were taken up by the relator which were not buried by him. Disinterested witnesses have sworn that there was no other way in which these bodies could be there buried.

Under the fifth specification, the witnesses Knight and Kehn swear that the relator asked them to let horses loose into the part of the cemetery known as the Jewish part, that they might trample upon the graves and cause dissatisfaction with the work of one Scudder, who was employed by certain Jewish lot owners to take care of their graves. The purpose of this request is charged to cause the dismissal of Scudder, so that the relator might have Scudder's work, in caring for the graves in that part of the cemetery. This is denied explicitly by the relator. There is no claim that any horses were let in, and one of the witnesses swears that there were no horses round about there loose that could be let in. The story is an improbable one, at best; but, nevertheless, if sworn to by credible witnesses, would raise the issue, the determination of which would probably not be disturbed. It may be instructive, then, to examine for a moment the witnesses who are called upon to prove these charges. In the first place, the witness Knight

signs the charges, as he swears, at the request of a Second Ward politician, whose father-in-law was thereafter appointed to the place made vacant by the removal of the relator. He had a difference with the relator at the time he was discharged by the relator, and afterwards brought a suit against the relator, which, however, he did not prosecute, but allowed to be dropped. He went to the former mayor and preferred like charges to those that have been here preferred by him, which were dismissed by the mayor after an informal investigation, without the formality of written charges and trial. He swears frankly to hard feelings against the relator. The second witness is one Kehn, who was also once in the employ of the relator, but left by reason of difference between himself and the relator, who also swears to hard feelings against the relator. By two witnesses Kehn is sworn to have stated, if the relator could be removed, he and Knight were both to have places under the new superintendent. These are the two witnesses who swear to this most improbable story, denied by the relator. The charge is, in my judgment, clearly not proven.

Under the sixth specification the respondent is found guilty of improper conduct in taking up a certain water pipe through which water was conducted from a hydrant in the center of the cemetery to another part thereof, which pipe emptied into a barrel sunken into the ground, from which the witness Scudder took water to sprinkle upon the graves in the Jewish part of the cemetery. It does not appear in the evidence just how far this water was carried from this hydrant. It is admitted by the relator that he took up this pipe, which was stretched across the top of the ground, covered with a board, and was, he says, an unsightly object. He admits that it would necessitate the drawing of water from the hydrant a further distance than from a barrel into which this pipe led, which was nearer to the Jewish part of the cemetery. Thereafter, and within a short time, at the request of the superintendent of public works, he restored it, and it has remained there from that time—some time in 1900—until the present time. The relator justifies his act not only upon the ground that the pipe was an unsightly object, but upon the ground that the water was often permitted to run so that the barrel overflowed, and the ground which was in the Potter's Field, so called, was frequently allowed to become marshy and wet. Even if it be admitted that there was, in connection with other motives, an intent to embarrass Scudder in his care of the graves in the Jewish part of the cemetery, in my judgment no substantial ground is offered in this act for a dismissal of the relator. This also was one of the charges preferred by Knight before the former mayor, which was informally investigated and dismissed as being too trifling for action.

As to the tenth finding, that the relator failed to furnish proper assistance and ropes for the purpose of lowering bodies into the grave, it is claimed that one Knight, who was at that time an employé of the relator, was directed to make the burial of one of the city's poor—of a body which was at the time in a vault—and that he was not furnished with ropes with which to lower the body into the grave, and was told to get them in the best way he could. In the first place, this is fully denied by the relator. But upon the story of Knight, no reasonable cause is shown for the relator's removal. They had some old straps

there when the relator first assumed the position. As soon as he found out what there was there, he procured some new straps. This was the second body that Knight had buried, and he was unable alone to get it properly into the grave, so that one end stood up a little further than the other. That was the only incident in all his experience in which he was ever asked to bury a body alone. Upon the evidence of the relator, it appears that no such body was in the receiving vault, as the city's poor were never placed therein. This charge was also informally made before the former mayor, and, upon examination, was dismissed. It occurred, if at all, in 1900—four years before the trial. The charge is unworthy of consideration.

It is thus seen that most of these charges had been informally preferred against relator before a former mayor, who had made informal investigation thereof, and had dismissed them. While this action of the former mayor may not be conclusive, so as to preclude their investigation by respondent here, the fact that the charges are stale, and have been once officially passed upon, though informally, is not without weight in our determination that no sufficient ground of discharge has been shown. The allegation in respondent's return that those charges were dismissed by the former mayor for political reasons, and by reason of personal friendship, is wholly without foundation in the evidence.

As against these charges, the relator made proof, which was uncontradicted, to the effect that during his superintendency the cemeteries had been kept in excellent condition—fully as well as, if not better than, they had ever been kept before. No charge has been proven against the relator which can fairly be made a warrant for his dismissal. To uphold this determination would be to nullify the protection vouchsafed by the statute to the veterans of the Civil War. While the mayor of the city has given to this relator a full and fair hearing, his determination is not supported by the evidence, and must therefore be reversed.

Determination reversed, and the relator ordered reinstated in the position from which he was removed, with $50 costs and disbursements. All concur.